1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10
11

JOSEPH FAHEY,

No. C 06-06554 CRB

12

    Plaintiff,

**FINDINGS OF FACT &
CONCLUSIONS OF LAW**

13

    v.

14

WESTERN CONFERENCE OF
TEAMSTERS PENSION PLAN,

15
16

    Defendant.

                                          /

17
18

      Plaintiff Joseph Fahey ("Fahey") sued the Western Conference of Teamsters Pension

19

Plan ("the Plan") under ERISA § 502(a)(1)(B), claiming that he is entitled to pension credits

20

and service points for the four and a half years he served as president of Teamsters Local 912

21

("Local 912") without compensation, between 1994 and 1999. The question presented by

22

this case is whether Fahey was an "employee" when, between 1994 and 1999, he provided

23

services to Local 912 but received no compensation from the union. The Court held a bench

24

trial on June 22, 2007, and ordered supplemental discovery and briefing. The parties have

25

now submitted their supplemental briefs, and this opinion sets forth the Court's findings of

26

fact and conclusions of law, as required by Federal Rule of Civil Procedure 52(a). The Court

27

now holds that because the weight of the factors set forth in Nationwide Mutual Ins. Co. v.

28

Darden, 503 U.S. 318, 323 (1992), support the Plan's argument that Fahey was not an

employee of Local 912 between 1994 and 1999, Fahey is not entitled to the pension benefits

he seeks.

The following facts are undisputed. Fahey began working for Local 912 in 1986 as a full-time, paid business agent. He was elected president of the union a few years later. The union's presidency was and remains a paid position, whose duties include, <u>inter alia</u>, presiding over executive board meetings and union membership meetings.

In November of 1994, Fahey assumed a new position with International Brotherhood of Teamsters ("IBT") as a Warehouse Division Representative for Food Processing. He received a salary, pension and other benefits from IBT. While employed by IBT, Fahey continued to serve as president of Local 912 and presided over approximately half the union's executive board and membership meetings. During this time, Local 912 provided Fahey with an office, office equipment and supplies, and reimbursements for work expenses. Springer-Sullivan Decl. Ex. 4, ¶¶ 8,10. However, Local 912 removed Fahey from its payroll and paid him no salary during this period. Furthermore, after Fahey began working for IBT in 1994, Local 912 hired an organizer to assume some of the tasks previously performed by Fahey. <u>See</u> Lopez Decl. ¶ 5. Three years later, in 1997, Local 912 also hired a business agent, Gloria Tapia ("Tapia") to handle additional tasks that Fahey had done when he was working full-time for the union. In 1999, Fahey stopped working at IBT. In April of 1999, Fahey resumed his job at Local 912 as a business agent and continued to serve as president. Immediately before Fahey returned to the union's payroll in 1999, Local 912 laid off Tapia to make room for Fahey's salary. <u>See id.</u>

Up until 1994 and after 1999 – both before and after Fahey's employment at IBT – Fahey accrued pension benefits and service points with Local 912. Between 1994 and 1999, while Fahey was working for IBT but still serving as the union's president, Local 912 did not make contributions to the Plan on his behalf, and Fahey did not receive any pension benefits or service credits. This lawsuit involves Fahey's attempt to recoup those benefits during the four-year time period when Fahey was employed by IBT.

The parties dispute the nature of the relationship between Fahey and Local 912 between 1994 and 1999. Specifically, the parties dispute whether the union intended to

1  retain Fahey as an employee, the nature of the services he performed, and the number of

2  hours he devoted to Local 912 work.

3    A. Parties' Intent

4    According to the Plan, there was an understanding that Fahey would serve as a

5  volunteer president with no expectation of receiving pension benefits. Local 912 Secretary-

6  Treasurer Sergio Lopez ("Lopez") allegedly shared a conversation with Fahey, in which

7  Fahey conveyed his understanding that he would not earn pension credit from Local 912

8  while off the payroll. Lopez Decl. at 2:6-8. According to Lopez, there were never any other

9  discussions or agreements between the Local 912 Executive Board and Fahey relating to

10  Fahey's status or the possibility of continuing pension contributions. Id. at 2:8-12.

11    Fahey contends he was a part-time employee of Local 912, and that he would have

12  been paid by the union except for the fact that he agreed voluntarily to forego compensation

13  because he did not want to take two salaries, due to his political philosophy as being a

14  proponent of a Teamsters reform movement. Fahey maintains that he and Lopez never had

15  any conversation about his not being eligible for pension benefits. Fahey Decl. ¶ 3. Fahey

16  states that he and Lopez had conversations about their differing opinions on receiving two

17  salaries, but "agreed to disagree." Id. Fahey stated he also forwent compensation because he

18  was "conscious of the precarious state of Local 912's finances," as supported by other

19  actions he took and statements he made indicating his own desire to preserve resources for

20  Local 912.[1]

21    Minutes of Local 912 Executive Board Meetings give conflicting accounts of whether

22  the union considered Fahey an employee while he worked for IBT. On the one hand, the

23  Minutes from November 22, 1994 indicate, "[Fahey will] be part time with Local 912

24  because of the Food Processing end of his IBT job for transition." Tanzi Decl. Ex. A at

25  00062 (emphasis added). On the other hand, later Minutes suggest that the union did not

26  consider Fahey to be an employee. In January 1999, the Local 912 Executive Board and

27

28    [1]See, e.g., Tanzi Decl., Ex. A at 395 (expressing opinion that Board Members should pay own way to conference); id. at 386 (attending conference as Local 912 delegate but getting reimbursed by IBT); id. Ex. C at 534 (moving to eliminate payments to Board).

3

Fahey began discussing his return to the union payroll.  Id. at 00440 ("[Fahey to] reclaim his job at 912 after IBT . . ."). The Minutes show that the Board and Fahey orchestrated his return to coincide with Tapia's departure from the payroll.  The Board arranged for Tapia to stay on until she had worked the 500 hours necessary to obtain a year of contributory service under the pension plan.  Id.  ("[K]eep [Tapia] till March for her 500 hours in 1999").  The Minutes further clarify, "[Tapia] to stay on until [Fahey] returns, and in no event will they both be on the payroll."  Id. at 00443.  Furthermore, the Minutes indicate that Fahey "would draw unemployment" between the time he left IBT until he could return to the Local 912 payroll.[2]  Tanzi Decl., Ex. A at 00440 (February 23, 1999, Fahey will "draw unemployment while [Tapia] still here"); id. at 00442-443 (March 23, 1999, "[Fahey] will be on unemployment and vacation, but will work some days. . .").

B. Nature of Services Performed

The parties disagree about what services Fahey performed for Local 912.  Fahey contends he performed the same services for Local 912 during his employment with IBT that he did prior to 1994, with the exception that he worked only part-time and did not handle union members' grievances at the initial and informal steps.  Fahey identifies the following services he performed as both a union representative and president between 1994 and 1999:

> [N]egotiating 912 contracts; overseeing the approval process for changes to the Local 912 bylaws; training Local 912 shop stewards; running the campaign for the Local 912 fruit-packer's contract; organizing a mobilization for the strawberry worker's organizing drive; supervising Local 912 organizers and assisting with organizing activities; designing, supervising and helping conduct membership surveys; conducting educational training sessions; processing Local 912 grievances that were at the formal steps of mediation and/or arbitration; serving as liaison to the United Farm Workers and AFL-CIO for joint organizing activities in Watsonville; negotiating effects bargaining agreements; establishing programs for Local 912 workers displaced by plant closings; and training peer counselors for displaced members of Local 912.

Springer-Sullivan Decl., Ex. 4, ¶ 10.

The record corroborates Fahey's account of his own activities.  For instance, the Minutes from union board meetings suggest that he engaged in each of these activities. Tanzi

_____

[2] Although the Minutes show that Fahey was present at these meetings, Fahey states that he does not recall any discussion regarding unemployment and that he did not apply for unemployment before returning to the union payroll.  Fahey Decl. ¶ 2.

Decl. Ex. A at 363-475; Ex. C at 620, 626. These Minutes also show that Fahey worked on some of the same projects for Local 912 before, after, and during the four years at issue. See, e.g., Tanzi Decl. Ex. C at 620, 626; Ex. A at 379, 438, 475 (Local 912 bylaws); id. Ex. C at 572, 574, 621, 625; Ex. A at 394, 396, 402 (Driscoll contract negotiations); id. at 414, 416, 418, 420, 422, 438, 455, 459, 464, 470, 475, 478 (Martinelli contract negotiations). Pamela Cheaney, a Local 912 business agent and Vice President during the four years, stated that she witnessed most of Fahey's activities and that she worked with him on a regular basis during that period. Springer-Sullivan Decl. Ex. 4 at 0023. Finally, Fahey has presented documentation of his activities, including letters from Fahey to various persons regarding union activities; media advisories and articles identifying Fahey as president of Local 912; speech notes; still shots from Fahey's appearance on the Today Show; a letter from the IBT approving changes in Local 912 bylaws which Fahey oversaw; and e-mail correspondence sent and received in his capacity as Local 912 president. Id. at 0017-77.

The Plan does not deny that Fahey performed these services. Rather, the Plan contends that most of the services Fahey performed between 1994 and 1999 were performed not in his capacity as the Local 912 president, but rather in his capacity as an employee of IBT. Apart from presiding over some executive board and union membership meetings, the Plan argues that Fahey performed or could have performed most of these services in his capacity as an employee of IBT. Lopez, who oversaw all operations and supervised all employees, states that "the bulk" of the services that Fahey lists in his declaration "were performed in connection with his IBT duties, which included assisting local unions in their organizing, training, and bargaining activities." Lopez Decl. ¶ 7. Indeed, to show that some of these services were within the scope of his job with IBT, the Plan points to the very documents presented by Fahey in support of his claim, including a media advisory about an event highlighting the food processing industry that identified Fahey in both his work roles, Springer-Sullivan Decl. Ex. 4 at 0025; a letter Fahey authored that mentioned IBT and food processing, id. at 0035-36; and an article quoting Fahey about a rally of Local 912 food processing workers, id. at 0040. The Plan also points to Fahey's IBT monthly expense

5

reports in which he listed the same negotiations that he also listed as activities performed for

Local 912.  See, e.g., Tanzi Decl. Ex. A at 00074 (Martinelli meetings on February 9, 13, 14,

and 16, 1997); id. at 00077 (Driscoll bargaining on February 11 and 12).

C. Hours

In a similar vein, the parties disagree about the number of hours Fahey devoted to his

work for Local 912 and whether the record supports a conclusion he worked the requisite

minimum 500 hours per year to be eligible for pension credit.[3]  During the four years he

worked for IBT, Fahey kept no record of the number of hours he worked specifically for

Local 912.  The Plan points out that none of the documentation Fahey puts in the record,

such as media releases and articles that identify him as president of Local 912, indicates what

amount of work he actually did or how many hours he devoted to it.  According to the Plan,

Annual LM-2 Reports filed by Local 912 showing that Fahey was reimbursed by Local 912

for relatively small work expenses demonstrate that he performed minimal work for the

union.[4]  In 1995, 1996, and 1998 Fahey received just $205, $8, and $247 in reimbursement

for Local 912-related expenses.  Tanzi Decl. Ex. A at 00042, 00048, 00056.  In comparison,

other officers were reimbursed for thousands of dollars each year.  Id.  Fahey's expense

reports submitted to IBT during the same time period show that Fahey was reimbursed for

---

[3]Under the terms of the Plan and the Pension Agreements between the Plan and Local 912, Local 912 employees are eligible for (1) employer contribution account benefits and (2) PEER service points (worth one year of contributory service towards their pension).  Under the Pension Agreements, Local 912 was required to contribute an amount "per compensable hour" for each employee.  An employee "compensated for 32 or more hours" per week would receive a contribution of 40 hours, and an employee "compensated for less than 32 hours" per week would receive a contribution "based on the Employee's actual number of compensable hours during that calendar week."  To earn a PEER point, the employee must complete at least 500 "Covered Hours" per year, that is, "hour[s] of Covered Employment."  Tanzi Decl. Ex. A at 00272-275.

[4] See Tanzi Decl. Ex. A at 00042, 00048, 00056 (showing Fahey was reimbursed for relatively small amounts of work expenses between 1994 and 1999 compared to other Local 912 officers); id. at 00073-00107 (showing Fahey's reimbursements from IBT were significantly greater); Declaration of Robert F. Schwartz Ex. A at 00009, 00025, 00043, 00059 ( showing Fahey's reimbursements from Local 912 were significantly less than before 1994 and after 1999).

6

1    hundreds and sometimes thousands of dollars each month.[5] Id. at 00073-00107.

2    Furthermore, after Fahey returned to Local 912's payroll in 1999, his reimbursements

3    increased significantly. *See* Schwartz Decl., Ex. A at 00009, 00025, 00043, 00059 ($2,543,

4    $6,213, $3,917, $3,481 for years 2000-2003).

5          By contrast, Fahey states that he worked "well over 500 hours" per year for Local

6    912. Springer-Sullivan Decl., Ex. 4 ¶ 6. He admits that not all his work was documented,

7    but argues that what documentation he does present leads to this conclusion. For instance,

8    Fahey points to documentation that shows he sometimes worked non-business hours for

9    Local 912.

10                                    **STANDARD OF REVIEW**

11          Because the Plan failed to rule on Fahey's claim for pension credits – filed in

12    February of 2006 – within ERISA's 90-day time limit, Fahey filed his complaint in this Court

13    before issuance of a formal denial of benefits.[6] See 29 C.F.R. § 2560.503-1(f)(1). The

14    parties have stipulated that de novo review of the denial of benefits is appropriate, but

15    disagree on what materials may form the basis of the Court decision. The Court concludes

16    that it is appropriate to consider evidence outside the administrative record considered by the

17    Plan administrator. This approach is consistent with the de novo review typically exercised

18    in ERISA cases, wherein a court may permit the introduction of any evidence that is

19    beneficial and necessary to the exercise of informed and independent judgment. See

20    Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan, 46 F.3d 938, 944 (9th Cir.

21    1995) (holding that the court may exercise discretion to review additional evidence "where

22    circumstances clearly establish that additional evidence is necessary to conduct an adequate

23    de novo review of the benefit decision").

24    ///

25

26         [5] Fahey contends that the fact he was reimbursed by IBT for relatively large work
expenses reflects that his national work for IBT required greater expenses (e.g., for travel and
27    lodging) than did his Local 912 work at his home in the Watsonville, California area.

28         [6] The Plan subsequently denied Fahey's claim on February 27, 2007, more than four
months after this lawsuit was filed, and approximately a year after the claim itself was filed.

According to the terms of the pension plan under which Fahey seeks benefits, individuals could only participate in the plan if they were "Employees." See Tanzi Decl. Exh. D § 1.2. The plan defined employee as "a person who is a common-law employee" of Local 912. See id. § 20.24. Fahey's claim for benefits therefore turns on whether the plan was obligated to make contributions to Fahey's pension between 1994 and 1999 because Fahey was a "common-law employee" during that time period.

The Supreme Court set forth the common law definition of "employee" in Nationwide Mutual Insurance Co. v. Darden, 503 U.S. 318 (1992). In Darden, the Court explained that:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Id. at 323-24 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52 (1989)). "Since the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" Id. at 324 (quoting NLRB v. United Ins. Co. of America, 390 U.S. 254, 258 (1968)). Thus, in applying the common-law test adopted in Darden, the Court must weigh all incidents of Fahey's relationship with Local 912 to determine whether Fahey met the common law definition of "employee."

To be sure, certain factors identified in the Darden test favor Fahey. First, Fahey performed work that was part of Local 912's regular business. Some of Fahey's tasks – including union organizing activities and the processing of union grievances – were performed exclusively for Local 912, and not in Fahey's capacity as an employee of IBT. See, e.g., Tanzi Decl. Exh. A at 383. Second, Fahey performed services for Local 912 for a duration of time – almost four years – that suggests a traditional employment relationship.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

But see Barnhart v. New York Life Ins. Co., 141 F.3d 1310, 1313 (9th Cir. 1998) (concluding that insurance agent was independent contractor despite sixteen year relationship with insurance company). Additionally, it is telling that Local 912 employed Fahey before 1994 and after 1999. See id. Third, between 1994 and 1999, Local 912 provided Fahey with the instrumentalities and tools required for his work on behalf of the Local, including office space, equipment and supplies, and reimbursements for work expenses.

Considering all factors as a whole, however, the balance tips in favor of the Plan's contention that Fahey was not a common-law employee between 1994 and 1999. First, and most importantly, Local 912 maintained little control over the manner and means by which Fahey performed work for the union. See Lopez v. Johnson, 333 F.3d 959, 962-63 (9th Cir. 2003) ("The extent of the employer's right to control the means and manner of the worker's performance is a primary factor.") (quotation omitted). While Fahey was expected to account for his activities at Board meetings and to be present at certain bargaining sessions and meetings, Local 912 exerted less control over Fahey and his schedule than would be expected if Fahey were an employee. Fahey enjoyed the freedom to set his own schedule; he was not required to work a certain number of hours and his work was unsupervised. See Lopez Decl. ¶ 7 ("I had no authority to set [Fahey's] hours, ask for an accounting of his time, or otherwise direct his activities."). Sergio Lopez, who supervised Fahey for Local 912 before 1994 and after 1999, testified that when Fahey worked for IBT, Fahey could "do whatever he wanted" and was not answerable to Lopez. See Lopez Depo. at 101:1-10. Consistent with Local 912's lack of authority over Fahey, Fahey never bothered to track hours spent working on Local 912 projects. See Fahey Depo. at 16:6-13. To the extent that Fahey was required to account for his activities at Board Meetings and be present for certain bargaining sessions and meetings, those requirements were consistent with his position a volunteer part-time union president.

Second, it is highly probative that Fahey received no salary during the time in question. The Ninth Circuit has not joined other circuits in holding that compensation is an "essential condition" to the existence of an employer-employee relationship. Graves v.

9

**United States District Court**
For the Northern District of California

Women's Prof'l Rodeo Ass'n, 907 F.2d 71, 74 (8th Cir. 1990); see also O'Connor v. Davis, 126 F.3d 112, 116 (2d Cir. 1997). But even if not dispositive, the fact that Fahey received no wages for his work on behalf of Local 912 weighs heavily against the notion that Fahey performed his duties in the guise of an employee. At the least, the "method of payment" factor weighs against Fahey since there was no payment at all.

Other factors involved in the common law analysis – including the manner in which the work relationship was terminated and the intention of the parties – support the Plan. See Adcock v. Chrysler Corp., 166 F.3d 1290, 1292 (9th Cir. 1999). Fahey and the Board of Local 912 carefully orchestrated Fahey's return to the payroll by terminating business agent Tapia to clear up funds. The clear implication of the Board's action was termination of one employee (Tapia) to make room for the re-hiring of another (Fahey).[7] Additional circumstances evidence that the parties did not intend to retain Fahey as an employee between 1994 and 1999. Between 1994 and 1999, Fahey received a full income and pension and health benefits from IBT, making it unlikely that the parties also intended for Fahey to receive duplicative benefits from Local 912. In addition, Fahey never informed Local 912 that he expected pension benefits to continue, never entered into an agreement with Local 912 regarding continued pension contributions, and never inquired into the status of his Local 912 pension. See Fahey Depo. 16:6-25.

///

---

[7] Tapia was terminated effective Friday, April 2, 1999, and Fahey returned to the Local 912 payroll the next Monday. See Fahey Depo. at 28:3-8.

10

Determining whether a relationship is one of employment requires a "fact-specific inquiry which depends on the economic realities of the situation." <u>Adcock</u>,166 F.3d at 1292 (internal quotation omitted).  In the Court's opinion, the economic realities of the relationship between Local 912 and Fahey compel the conclusion that Fahey was not an "employee" of the union.  Accordingly, Fahey is not entitled to pension benefits for the time he served as an IBT employee between the years 1994 and 1999.

**IT IS SO ORDERED.**



Dated: February 1, 2008

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California